IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BARBARA KRAGOR,                        x

          Plaintiff,              :

vs.                                    :     CIVIL ACTION
                                             FILE NO. 1:10-cv-00125-WCO

TAKEDA PHARMACEUTICALS              :
AMERICA, INC.,
          Defendant.              :
_____ x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Statement of the Facts

Barbara Kragor, Plaintiff herein (hereinafter "Plaintiff" or "Ms. Kragor")

was hired by Defendant, Takeda Pharmaceuticals America, Inc. (hereinafter

"Defendant" or "Takeda") on or about April 5, 1999 in the position of Sales

Representative. (Undisputed Fact No. 6).  Ms. Kragor's date of birth is xx/xx/1959.

(Undisputed Fact No. 6).  Takeda is a pharmaceutical company. (Undisputed Fact

No. 1).  As a Sales Representative, Ms. Kragor's primary job duty was to sell the

drug Actos to physicians in the Atlanta area whose practices included the care of

diabetes. (Undisputed Fact No. 7).

In 2003, Ms. Kragor was promoted to the position of Medical Center

Representative, Alabama and Georgia. (Undisputed Fact No. 8).  In that position,

1

Ms. Kragor sold Actos as well as two other drugs to hospitals and teaching facilities. (Undisputed Fact. No. 9).  In 2005, Ms. Kragor was promoted to the position of District Manager, supervising nine to ten Sales Representatives. (Undisputed Fact No. 12).

Although Ms. Kragor was promoted at the age 44, she was forced to conceal her age. (Kragor Dep. 248)  Throughout Ms. Kragor's employment with Takeda she was made aware that the company considered employees' ages when making employment decisions.  When Tony Shaw hired Ms. Kragor he told her to never let anyone know her age. (Kragor Dep. 248).  He also told Ms. Kragor that she was the oldest District Manager in the district. (Kragor Dep. 248).

Dan Orlando, Vice President of Sales-Diabetes and the person who made the decision to fire Ms. Kragor, said at a District Managers advisory board meeting several months before Ms. Kragor was fired, "we need to hire younger people". When one attendee at the meeting commented that as a result of a reduction in force by Pfizer, there were quite a lot of very experienced available as a pool of candidates, Mr. Orlando specifically said that those "are not the people we want", but rather "younger people". (Undisputed Fact No. 72; Orlando Decl., ¶¶1, 9; Kragor Dep. 253, Kragor Decl. ¶5). Jen Jennings had been the facilitator of that District Manager's advisory board meeting. (Kragor Decl. ¶5).

During her employment as a District Manager with Takeda Ms. Kragor's immediate supervisors were Kirk Barnes, Jay Cardiello and Jen Jennings. (Kragor Dep. 71 – 72). Kirk Barnes told Ms. Kragor, "It is not always good to let people know how old your boys are", and that she was the oldest District Manager in the region. (Kragor Decl., ¶¶2, 4; Kragor Dep. 249). Jay Cardiello asked Ms. Kragor why she got into the industry so late in life and how long she planned on working. (Kragor Dep. 251). Jen Jennings said to Ms. Kragor, that she has a "pretty old team" and "Your team is pretty old. You need to get some new, younger people on your team", that Ms. Kragor "need[ed] some younger blood in there". (Kragor Dep. 245, Kragor Decl. ¶6), "I hope I look that good when I am your age" (Kragor Dep. 244), "Can you believe how hold her boys are?" [referring to Ms. Kragor], (Kragor Decl., ¶3), and that that by having pictures of her sons on her screen saver it "gives away [Ms. Kragor's] age". (Kragor Decl. ¶7). Ms. Kragor was asked directly hold old she was by Kirk Barnes, Jay Cardiello and Jen Jennings. (Kragor Dep. 244). About six months prior to Ms. Kragor's dismissal, Jen Jennings told all of the District Managers in Ms. Jennings' district that she wanted "young energetic people", that no district manager should send her anyone to interview who was not "young and energetic" because she would reject any such candidate. (Kragor Decl. ¶8).

Upon becoming District Manager in 2005, Ms. Kragor's district included the medical practice of one Dr. Bruce Bode. (Kragor Dep. 121).  Ms. Kragor did not know Dr. Bode before she started working for Takeda in 1999. (Kragor Dep. 148). She became aware of Dr. Bode from referrals made by other physicians. (Kragor Dep. 148).  As a result of these referrals, Ms. Kragor began using Dr. Bode as a speaker at speaker events that she organized as a Sales Representative. (Kragor Dep. 149).  Ms. Kragor first met Dr. Bode in person at one of the speaker events. (Kragor Dep. 151; Bode Dec. ¶3).

By coincidence, Bud Kragor, Ms. Kragor's husband, knew Dr. Bode as a golfing partner before Ms. Kragor had heard about Dr. Bode. (Kragor Dep. 154). Ms. Kragor became aware of her husband's friendship with Dr. Bode at a Takeda event when Dr. Bode was speaking and people brought their spouses, and Ms. Kragor's husband and Dr. Bode recognized each other. (Kragor Dep. 155).  This was when Ms. Kragor was still a Sales Representative. (Kragor Dep. 155).

At all relevant times, Ms. Kragor's husband was employed as a pilot for Delta Airlines. (Kragor Decl., ¶15).  In that capacity, Mr. Kragor was able to obtain discounted airline tickets, known as "buddy passes." (*Id*.).  As a result of Mr. Kragor's pre-existing friendship with Dr. Bode, and since Mr. Kragor was able to obtain buddy passes as a Delta pilot, Mr. Kragor would from time to time sell buddy passes to Dr. Bode. (*Id*.; Bode Decl. ¶4).  At all times Dr. Bode would pay

4

the full market price for the buddy pass. (Kragor Decl., ¶5; Kragor Dep. 165, 167; Bode Decl. ¶4).

Upper level management at Takeda know all about Dr. Bode and Bud Kragor golfing together and about the aforesaid practice whereby Ms. Kragor would act as intermediary in Dr. Bode purchasing buddy passes from Bud Kragor. (Kragor Dep. 165, 216, 217; Kragor Decl. ¶17).  Ms. Kragor specifically told her supervisors, Kirk Barnes, Jay Cardiello and Jen Jennings about it. (Kragor Dep. 217; Kragor Decl. ¶17). Kirk Barnes, one of Ms. Kragor's supervisors, also golfed with Dr. Bode. (Kragor Dep. 216).  Thus, upper level management at Takeda knew all about these arrangements well in advance of any investigation in the summer of 2008. (Kragor Dep. 165, 216 – 17; Kragor Decl., ¶¶17, 18).

In or about July/August 2008, Ms. Kragor's husband and two sons were planning a trip to Ireland to golf at a golf course at which Dr. Bode was a member. Dr. Bode made arrangements for the golf outing via his membership, and had the expenses billed to him as a member, with the explicit understanding that Mr. Kragor would reimburse Dr. Bode after he received the bill from the golf club.  At or about the same time, Dr. Bode purchased buddy passes from Mr. Kragor, using Ms. Kragor as an intermediary since Mr. Kragor was unavailable at the time.  Dr. Bode offered to provide his credit card information to be billed for the buddy passes, but Ms. Kragor offered to put the expense on her own (personal, not

corporate) American Express card to offset the anticipated money that the Kragors would owe to Dr. Bode once he received the bill from the golf club in Ireland. After subsequently receiving notice of the amount billed by Dr. Bode, Mr. & Ms. Kragor reimbursed Dr. Bode. (Kragor Dep. 219 – 31; Kragor Dep., Ex. 25; Kragor Decl. ¶19; Bode Decl. ¶5).

In 2008, Takeda merged with TAP Pharmaceuticals.  As a result of the merger numerous Takeda employees were deemed "assigned but displaced", which meant that those employees effectively did not have a job.  (Kragor Decl., ¶9). One of those employees who was deemed assigned but displaced as a result of the merger was Autumn Jeter. (Kragor Decl., ¶9; Kragor Dep., 144 – 45).  Ms. Jeter was a displaced District Manager residing in Tennessee. (Kragor Dep., 255).  At the time that Ms. Kragor was fired, her district also included Tennessee, in fact denominated the "Chattanooga District".  (Kragor Dep. 117, Kragor Decl. ¶11). Ms. Jeter was 18 years younger than Ms. Kragor. (Undisputed Facts Nos. 6, 83). At the time that Ms. Kragor's employment was terminated by Takeda, Ms. Kragor was 49 and Ms. Jeter was 31. (*Id*.).

On or about August 25, 2008, Ms. Kragor was advised that she was being investigated by the Compliance Department for allegedly providing buddy passes to Dr. Bode and allegedly having authorized Sales Representatives to expense holiday parties for Dr. Bode. (Undisputed Facts Nos. 56 – 58). The next day, Ms.

Kragor met with Melissa Anderson, Regional Human Resources Manager, and Ed Flynn, Manager, Investigations, regarding those allegations. (*Id.*)  Ms. Kragor denied that she had authorized the expense of holiday parties for Dr. Bode or that she had given buddy passes to Dr. Bode.  Ms. Kragor stated that, in view of her husband's pre-existing friendship with Dr. Bode, she facilitated her husband's sale of buddy passes to Dr. Bode at times when her husband was unavailable. (Kragor Dep. 185 – 87).  The following day, Ms. Kragor forwarded to Ms. Anderson various emails regarding the aforesaid events in July/August 2008 regarding her sons' golfing outing to Ireland and Dr. Bode's purchase of buddy passes. (Undisputed Fact No. 63).

Takeda's representatives refused Ms. Kragor's request that they interview Dr. Bode to confirm her statements. (Kragor Decl., ¶22; Kragor Dep. 200, 207; Bode Decl., ¶7).  Further, the hearsay and thus inadmissible statement attributed to Jason Diaz – the Sales Representative who had improperly expensed a holiday party for Dr. Bode – establishes that Ms. Kragor did not authorize the expense. (Undisputed Facts Nos. 50, 51).[1]

---

[1] Ms. Anderson's statement that, "Diaz said that he and [Ashley] Woodlief had specifically confirmed the way in which they intended to expense the parties for Dr. Bode with Kragor" is contradicted by her previous statement that, "Diaz further told us that, while Kragor had not specifically requested that they expense the parties for Dr. Bode, Diaz believed it was an expectation  she had." Anderson Decl., ¶9.  On this motion for summary judgment, the Court must view the facts in the light most favorable to the plaintiff, and must make all factual inferences in his favor.  See, p. 15, *infra*. Thus as a matter of law, the statement that Ms. Kragor specifically authorized the expense must be disregarded because it is contradicted by the previous statement that Ms. Kragor did not specifically authorize the expense.  In any event, Mr. Diaz's statements must be disregarded in their entirety as inadmissible hearsay.

On September 3, 2008, Ms. Kragor was told that she had been fired. (Undisputed Fact No. 80). The decision was made by Dan Orlando. (Undisputed Facts Nos. 77, 78; Orlando Decl., ¶9; Kragor Decl., ¶12). After Ms. Kragor had been fired, Mr. Orlando called Dr. Bode and admitted that in his opinion Ms. Kragor had not done anything wrong, that she had done everything right, and that she should not have been fired. (Bode Decl., ¶8).

Pam Cofield was a Sales Representative who for an interim period of time was under Ms. Kragor's immediate supervision. (Kragor Dep. 102, Kragor Decl. ¶14). Ms. Kragor became aware that Ms. Cofield was having an affair with a physician, Michael Brady, who prescribed Takeda products and was in Ms. Cofield's territory. (Kragor Decl. ¶14). Ms. Kragor became aware that Ms. Cofield was the only Sales Representative using Dr. Brady as a speaker thus providing him with monetary honoraria and taking him to Takeda sponsored dinners with her. (Kragor Dep. 101; Kragor Decl. ¶14). Ms. Kragor knew of her own personal knowledge that Ms. Cofield was having the affair and dating Dr. Brady. (Kragor Dep. 103; Kragor Decl., ¶14).

On or about September 25, 2007, Pam Cofield was found to have violated Defendant's compliance policy by having Dr. Brady as a speaker at Defendant's events even though she had a personal relationship with him. Ms. Cofield was given no more than a warning and a direction not to plan any future events with Dr.

8

Brady as a speaker.  Melissa Anderson, among others at Defendant, was aware of this. (Exh. 1).

Ms. Kragor was replaced by Autumn Jeter, who, at 31 years of age, was 18 years younger than Ms. Kragor. (Undisputed Facts Nos. 6, 83, 87).

<u>Summary of the Argument</u>

Barbara Kragor was fired based on an alleged violation of Defendant's compliance policy which she in fact did not do, even though Defendant's Compliance Department refused to interview the physician to whom she allegedly had provided items of value, and even though the corporate Vice President who made the decision to fire Ms. Kragor later admitted to that physician that she had done nothing wrong and should not have been fired.  Defendant's acts were not taken in an age-neutral workplace environment.  To the contrary, throughout Ms. Kragor's employment at Takeda, she heard numerous comments, both direct and indirect, indicating that the company considered employees' ages when making employment decisions.  Within weeks after Ms. Kragor was fired, she was replaced by an employee 18 years younger than her, who had been displaced as a result of a merger and needed Ms. Kragor's job to remain employed with Takeda.  Takeda's articulation that Ms. Kragor was fired for giving an item of value to a physician or in the alternative for engaging in acts creating the appearance of impropriety, is undermined by the facts that the decision maker did not have a good faith belief

that Ms. Kragor had done anything wrong and that when the same Compliance Department discovered that another employee had been giving Takeda speaking fees to a physician with whom she had a romantic relationship, the employee was merely admonished not to do it again, and not fired.

ARGUMENT AND CITATION OF AUTHORITY

POINT I
MS. KRAGOR ESTABLISHED A *PRIMA FACIE*
CASE OF AGE DISCRIMINATION

Courts "[i]n this Circuit have 'repeated[ly] eschew[ed] . . . an overly strict formulation of the elements of a prima facie case, especially in age discrimination cases." *Alphin v. Sears,Roebuck & Co.*, 940 F.2d at 1500, *citing*, *Carter v. City of Miami*, 870 F.2d 578, 583 (11th Cir. 1989).  Here, it is undisputed that Ms. Kragor was in the protected age group, that she was qualified to do her job, that she suffered adverse employment action by being fired, that age-related comments were made by upper level management including the person who made the decision to fire Ms. Kragor, and that she was replaced by a substantially younger person outside the protected age group.  Accordingly, Ms. Kragor easily makes out a *prima facie* case of age discrimination which Defendant does not contest. (Def. Br., *passim*).

10

<u>POINT II</u>
<u>DEFENDANT FAILED TO ARTICULATE A LEGITIMATE NON-
DISCRIMINATORY REASON FOR FIRING MS. KRAGOR</u>

"A plaintiff may establish a prima facie case of age discrimination in one of three ways: (1) with direct evidence, (2) with circumstantial evidence, or (3) with statistical evidence." *Corbin v. Southland International Trucks*, 25 F.3d  1545, 1548 (11th Cir. 1994), Proof of age discrimination under the second method -- by circumstantial evidence -- is also known as the "*McDonnell Douglas - Burdine* test", since it uses the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (hereinafter "*McDonnell Douglas*"), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2 207 (1981) (hereinafter "*Burdine*"). *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527 (11th Cir. 1997); *Alphin v. Sears,Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991), *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

Under the *McDonnell Douglas - Burdine* test, the plaintiff has the initial burden of establishing a *prima facie* case of age discrimination. The burden then shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action.  Here, even though the burden of articulation is exceedingly light, Defendant has failed satisfy it.

11

Defendant's "articulation" is contained at p. 18 of its brief. Defendant states only, "Specifically, as set forth in detail above in Section II (D), Takeda terminated Kragor because it was determined that she violated Takeda's Code of Conduct, Compliance Policies, and Travel and Business Policies." Section II (D) of Defendant's brief is an expansive narrative setting forth in chronological detail an investigation allegedly conducted by Defendant into allegations that Ms. Kragor had violated Takeda's aforesaid policies. However, Plaintiff – and this Court – are left guessing as to precisely what Ms. Kragor was found to have allegedly done, or not done, or gave the appearance of having done, that caused her termination. Thus, for example, there is reference to Ms. Kragor allegedly authorizing improper expenses for doctors' holiday parties, but that is not mentioned anywhere in Dan Orlando's Declaration purportedly setting forth the reasons he approved Ms. Kragor's termination. There is also reference to a golf outing that was arranged by Dr. Bode, but again, that is not mentioned anywhere in Mr. Orlando's Declaration. The only issue mentioned by Mr. Orlando is the buddy passes purchased by Dr. Bode and with respect to that Mr. Orlando is vague. Thus, Mr. Orlando refers to ". . . Delta buddy passes provided to him [Dr. Bode] by Ms. Kragor *or her husband* . . ." (Orlando Decl., ¶9) (Emphasis added). This leaves Plaintiff – and the Court – guessing whether Ms. Kragor was fired because she allegedly gave buddy passes to Dr. Bode or because her husband did.

Indeed, despite the all the elaborate detail provided regarding the chronology of Defendant's compliance investigation, Defendant's brief leaves Plaintiff and the Court guessing who actually made the decision to fire Ms. Kragor, and why.  Mr. Orlando acknowledges in his Declaration that he ultimately approved the recommendation to fire Ms. Kragor, but then attempts to deny his responsibility for the decision by saying that he "deferred" to the "expertise" of Takeda's compliance, legal and human resources departments. (Orlando Decl., ¶9). An August 26, 2008 email from Melissa Anderson to Erika Marder reflects that Dan Orlando's input was central to the "group" dialogue. (Exh. 3).  So, Defendant leaves the record vague as to who actually is responsible for firing Ms. Kragor, but it is evident that Dan Orlando's input was pivotal, and indeed he admits to making the termination decision.

Further, aside from a specific reference to the buddy passes, Mr. Orlando makes only generalized statements that he was "provided with information and documents that were a part of the investigation".  (*Id*.)  And he states only that ""the information revealed by the investigation . . . . gave rise to the appearance of conduct on Kragor's part violating Takeda's Compliance Policies." (*Id*.)  This leaves Plaintiff and the Court guessing what specific information Mr. Orlando is referring to, and, more prominently, whether anybody ever made any finding that Ms. Kragor had in fact violated any of Takeda's policies.  Mr. Orlando notably

13

does not state that he or anybody else found that Ms. Kragor had in fact violated Takeda's compliance policies, only that "the information" "gave rise to the appearance" that Ms. Kragor had done so.

It is unfair to the Plaintiff and improper under the *McDonnel Douglas-Burdine* paradigm of proof, for the Defendant to simply make a generalized reference to a seven-page chronology of an investigation and effectively impose upon the Plaintiff the burden of deciphering what precisely was the reason that she was fired. While Defendant's burden of articulation is admittedly exceedingly light, Defendant nevertheless must satisfy it, and it may do so only by setting forth a clear, unambiguous reason for the Plaintiff's discharge so that she may have a reasonable opportunity to attempt to demonstrate pretext. Despite substantial detail regarding the alleged underlying investigation, Defendant has failed to clearly and unambiguously state a legitimate non-discriminatory reason for Ms. Kragor's discharge, mandating denial of Takeda's summary judgment motion.

POINT III
THE RE IS RECORD EVIDENCE FROM WHICH A JURY REASONABLY
COULD FIND THE DEFENDANT'S ARTICULATION TO BE PRETEXTUAL,
MANDATING DENIAL OF SUMMARY JUDGMENT

A. <u>Dan Orlando's admission that Ms. Kragor had not done anything wrong and that she should not have been fired.</u>

As noted above (Point I, *supra*), Plaintiff's task on Defendant's motion for summary judgment is improperly made more difficult by her having to guess what

14

Defendant's articulation is.  Nevertheless, there is record evidence that – whatever the stated reason – it is pretextual because Dan Orlando – the decision maker – himself did not believe it.  After Ms. Kragor was fired, Dan Orlando called Dr. Bode and told him that Barbara Kragor was an exceptional employee, that she had done nothing wrong, that she had done everything right, and further indicated that she should not have been fired. (Bode Decl., ¶8).  Clearly, this evidence that Mr. Orlando  -- the decision maker – did not believe that Ms. Kragor had done anything wrong and that she should not have been fired, must be accepted as true by the Court when deciding Defendant's motion for summary judgment.

In deciding Defendant's motion for summary judgment, this Court must view the facts in the light most favorable to the Plaintiff, and must make all factual inferences in her favor. *Maddow v. Proctor & Gamble Co., Inc.*, 107 F.3d 846, 851 (11th Cir. 1997); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1982).  "If the district court judge is 'faced with having to believe one party or the other' as to an issue of material fact, summary judgment is not appropriate." *Corbin v. Southland International Trucks*, 25 F.3d at 1548 (11th Cir. 1994), *citing*, *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987).  This evidence alone is sufficient for a jury reasonably to find that the

Defendant's articulation is pretextual, mandating denial of Defendant's motion for summary judgment.

Dan Orlando's "deference" to the compliance, legal and human resources departments to justify his belief that Ms. Kragor might have done something that warranted her termination is insufficient where, as here, he himself did not believe it. "[A] defendant's articulation of an 'honest belief' cannot immunize the defendant from scrutiny as to whether that belief was, in fact, honestly held." *Boyd v. Province Healthcare Company, Inc.*, 2005 WL3132394 (N.D. Ala. 2005 at *8, n.21). It is sufficient to demonstrate pretext if Ms. Kragor "show[s] that at the time her employer levied the sanction, the employer lacked a good-faith belief that she was guilty of the offense." *Lowry v. Regis Salons Corp.*,2006 WL2583224 N.D. Ga. 2006 at *19). *See* also, *Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001) (rejecting "good faith belief" defense that lacked any legitimate factual basis).

B. <u>Defendant lacked a good-faith belief that Ms. Kragor gave items of value to Dr. Bode</u>

The most salient omission from Defendant's elaborate investigation into whether Ms. Kragor gave buddy passes to Dr. Bode is the Defendant's obdurate refusal to ask Dr. Bode if she had done that. Ms. Kragor pleaded with Ms. Anderson and Mr. Flynn to speak to Dr. Bode but they refused to do so. (Kragor Decl., ¶22; Kragor Dep. 200, 207; Bode Decl., ¶7). Ms. Kragor told Ms. Anderson

16

and Mr. Flynn that the buddy passes were not hers but belonged to her husband, that her husband would provide them to Dr. Bode as a result of his pre-existing relationship with Dr. Bode as a golfing partner, and that she would only get involved as an intermediary when Bud Kragor was flying and thus unavailable to give the buddy passes to Dr. Bode himself. (Kragor Dep., 185 – 86).  Further, the buddy passes were not given to Dr. Bode, but rather, he paid full price for them. (Kragor Dep. 167 – 69).

As a result of Ms. Anderson's and Mr. Flynn's refusal to speak to Dr. Bode, Takeda to this day cannot say whether Ms. Kragor gave buddy passes to Dr. Bode or whether her husband did.  Thus, Mr. Orlando attempts to finesse this glaring and purposeful omission in Defendant's investigation by referring to "Dr. Bode's use of Delta buddy passes provided to him by Ms. Kragor *or her husband*." (Orlando Decl., ¶9) (Emphasis added).  In fact, Dr. Bode attempted to tell upper level management at Takeda that "Barbara Kragor had nothing to do with buddy passes" (Bode Decl., ¶8) but no one at Takeda would take his calls. (*Id*). Ms. Kragor's deposition testimony, taken together with Dr. Bode's testimony by Declaration, must be accepted a true by the Court in deciding Defendant's motion for summary judgment.

In view of Takeda's knowing refusal to interview Dr. Bode, Takeda may not now assert that even if Ms. Kragor had not provided buddy passes to Dr. Bode, it

17

held at good faith belief at the time of her termination that she had done so, since there was no good faith investigation. Takeda's refusal to find out the facts, Mr. Orlando's Declaration establishing that as far as he knew, the buddy passes might have been provided to Dr. Bode by Bud Kragor and not by Barbara Kragor, and Mr. Orlando's admission to Dr. Bode that he did not believe that Ms. Kragor had done anything wrong or should have been fired (Bode Decl., ¶8) is more than adequate to require submission to the jury on the issue of pretext.

C. <u>Defendant did not have a good-faith belief that Ms. Kragor authorized paying for Dr. Bode's holiday parties</u>

Initially, it is not at all clear that Defendant's articulation includes an assertion that Ms. Kragor authorized Takeda paying for Dr. Bode's holiday parties. (*See*, Point II, *supra*). Nevertheless, assuming *arguendo* that is part of the articulation, disputed issues of material fact as to this articulation warrant denial of the motion for summary judgment. Further, as above, Takeda cannot establish a good-faith belief that Ms. Kragor had authorized payment for Dr. Bode's holiday parties at the time that she was fired.

1. <u>It is a disputed material fact whether Ms. Kragor authorized holiday parties for Dr. Bode</u>

Whether or not Ms. Kragor authorized payment of Dr. Bode's holiday parties is a disputed material fact. Ms. Kragor emphatically denies that she had done so. (Kragor Dep. 187 – 202). There is no document establishing that *Ms.*

18

*Kragor* knowingly authorized Takeda's payment of Dr. Bode's holiday parties.  It is undisputed that Ms. Kragor never submitted an expense report that expensed a holiday party for Dr. Bode, or in fact that she submitted any expense report at all regarding Dr. Bode.  The expense reports submitted by Ms. Kragor's *subordinates* are on their face legitimate and do not reflect any improper payment for a holiday party. (*Id.*)  Ms. Kragor's deposition testimony that the expense reports submitted by Jason Diaz and Ashley Woodlief are on their face legitimate must be accepted as true when deciding Defendant's motion for summary judgment, especially since Defendant has failed to offer any evidence to the contrary, that the expense reports on their face raise any Takeda compliance issues.

In fact, Ms. Anderson's Declaration contains Jason Diaz's admission that Ms. Kragor never authorized payment for Dr. Bode's holiday parties.  Thus, Ms. Anderson quotes Mr. Diaz as admitting that, " Kragor had not specifically requested that they expense the parties for Dr. Bode" but rather, that "Diaz believed it was an expectation  she had." Anderson Decl., ¶9.[2]  Given Mr. Diaz's admission, Ms. Kragor's adamant denial, and the fact that the documents on their face reflect legitimate expenses, this Court must find that there are disputed issues

---

[2]  As noted above (*see*, n. 1, *supra*), Ms. Anderson's quote of Mr. Diaz's subsequent contradictory statement must be disregarded by this Court as inadmissible hearsay or in any event because the evidence must be construed in Ms. Kragor's favor when deciding Defendant's motion for summary judgment.

of material fact as to whether or not Ms. Kragor authorized payment for Dr. Bode's

holiday parties, requiring denial of Defendant's motion for summary judgment.

    2. <u>No good-faith belief that Ms. Kragor authorized payment</u>
       <u>for Dr. Bode's holiday parties</u>

As above (Point, III (B)), Defendant may not rely on a good-faith belief at

the time of her discharge that Ms. Kragor had authorized payment of holiday

parties for Dr. Bode because it refused to interview Dr. Bode.  Indeed, to this day,

Takeda cannot state with any certainty whether or not Ms. Kragor in fact

authorized payment of holiday parties for Dr. Bode. The witnesses disagree, the

documents are neutral on their face, and Takeda refused to find out for sure by

asking Dr. Bode (Bode Decl., ¶7; Kragor Dep., 187 – 202, 200, 207).  As

demonstrated above, disputed issues of material fact preclude this Court from

finding that Ms. Kragor in fact authorized payment for Dr. Bode's holiday parties.

Takeda's alternative articulation, that irrespective of the actual facts it held a good-

faith belief at the time of Ms. Kragor's discharge that she had done so, must be

rejected by this Court because Takeda's refusal to find out the facts at the time of

her discharge deprives it of any such good-faith belief.  Any assertion that Takeda

held a good-faith belief at the time of Ms. Kragor's discharge that she had

authorized payment for Dr. Bode's holiday parties is further undermined by Dan

Orlando's admission – at the time of Ms. Kragor's discharge – that she had not

done anything wrong and that she should not have been fired. (Bode Decl., ¶8).

20

D.  <u>Cofield Not Similarly Fired for Violating Takeda's compliance policy</u>.

Takeda's rush to fire Ms. Kragor based on conflicting evidence, without finding out all the facts and ultimately based on an allegation that either Ms. Kragor violated Takeda Compliance policy or created an appearance of impropriety, is contrasted with Takeda's refusal to take any disciplinary action against Pam Cofield who *was found* to have actually violated Takeda's Compliance Policies in connection with Dr. Brady whom Ms. Cofield was romantically involved, much less fire her.  On or about September 25, 2007, Pam Cofield was found to have violated Takeda's Code of Conduct and Conflict of Interest Policy by having Dr. Brady as a speaker at Takeda's events even though she had a personal relationship with him.  Ms. Cofield was given no more than a warning and a direction not to plan any future events with Dr. Brady as a speaker. Melissa Anderson, among others at Defendant, was aware of this. (Exh.1). Takeda's failure to take any action at all when Pam Cofield was found to have violated Takeda's compliance policies constitutes evidence from which a jury reasonably could find that Takeda's articulation based on Ms. Kragor's alleged violation of Takeda's compliance policies, or the appearance of having violated those policies, is pretextual and unworthy of credence, requiring denial of

21

Defendant's motion for summary judgment.[3] In any event the differential treatment

of Ms. Cofield and Ms. Kragor (whose termination paved the way for the

---

[3] Employees are "similarly situated" when they are comparable in *material* or *relevant* respects, not in all respects. *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir.2001). "[W]here a plaintiff seeks to establish the minimal prima face case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Id*. The Circuits routinely recognize that the scope and nature of similarity between comparators be in "material" or "relevant" respects, and that comparators need not be identical. *Anderson v. WBMG-42*, 253 F.3d 561, 565 (11th Cir. 2001) ("the law does not require that a "similarly situated" individual be one who has "engaged in the same or nearly identical conduct" as the disciplined plaintiff. Instead, the law only requires "similar" misconduct from the similarly situated comparator……. We also reject WBMG's position that ………whenever two different supervisors are involved in administering the disciplinary actions, the comparators cannot as a matter of law be similarly situated");*Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002), (relied on *McGuinness* with approval as "explaining [the] minimal showing necessary to establish co-workers were similarly situated."); *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002) (stating that, in determining whether an employee is similarly situated, a " 'court must look at all relevant factors, the number of which depends on the context of the case' "); *Conward v. Cambridge Sch. Committee,* 171 F.3d 12, 19 (1st Cir.1999) (stating that "[r]easonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances"); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (stating that "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather, ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects") (internal quotation marks omitted); *Bennun v. Rutgers State University,* 941 F.2d 154, 177-78 (3d Cir.1991) (holding that, even if one employee was "teaching-oriented" professor and plaintiff was "research-oriented professor, a comparison between the two can be made to determine if [the college's] five objective criteria for advancement to full professor were evenly applied"-even if composition of some of reviewing committees may have been different); *Mulugeta v. Regents of Univ. of Cal.,* No. C-01-0332 EDL, 2002 U.S. Dist. LEXIS 17013, at *44 (N.D.Cal. July 22, 2002) (stating that, even though "Employees A and B were disciplined by different decisionmakers," that "does not necessarily preclude them from being similarly situated to [the plaintiff]"); *Petsch-Schmid v. Boston Edison Co.,* 914 F.Supp. 697, 705 n. 17 (D.Mass.1996) (stating that requirement of same supervisor not applicable "particularly where a company has instituted company-wide standards of discipline ... intended to provide guidance to all company supervisors"); the question of "similarly situated" is generally an issue of fact. *See Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003) (stating that the question of whether an employee is similarly situated to the plaintiff is ordinarily a question of fact for the jury); *Graham v. Long Island R.R.,* 230 F.3d 34, 41 (2d Cir.2000) (same); *see also Gifford v. Atchison, T. & S.F.R. Co.,* 685 F.2d 1149, 1156 (9th Cir.1982) (concluding that EEOC report, which stated that there was reasonable cause to believe that plaintiff had been treated differently from similarly situated male employees, "was sufficient to create an issue of fact on this question"). The Supreme Court has observed that "precise equivalence in culpability between employees is not the ultimate question[,]" and, therefore, has directed the emphasis of the fact finder's inquiry to the question of "comparable seriousness." *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (Evidence of comparator employees involved in acts of "comparable seriousness [as the plaintiff] ... is adequate to plead an inferential case

substantially younger assigned but displaced Autumn Jeter) is a question of fact for

a jury. *Wright v. Kimberly Clark*, 1:08-cv-3897-RLV, N.D.G.A. May 3. 2011

(denying summary judgment, rejecting defendant's argument that comparators not

similarly situated for a variety of reasons, and affirming that determining whether

individuals are similarly situated is generally a question of fact for the jury, *citing*,

*Douglas Asphalt Co. v. Oore, Inc*., 531 F.3d 1269, 1274-75 (11th Cir. 2008).

   D. Age-related comments by Takeda upper level management

   Defendant writes its brief as if the relevant events took place in an age-

neutral workplace environment, but in fact the reverse is true.  Ms. Kragor testified

to numerous ageist statements by her immediate supervisors set forth in detail at

pages 2-3 above. These statements both refer to Ms. Kragor directly and more

generally indicate a clear desire to get young blood and were made by several high

level managers, including by VP Dan Orlando, who decided to fire Ms. Kragor

despite his belief that she did nothing wrong and should not have been fired. These

statements, while not direct evidence are nevertheless strong circumstantial

evidence of age bias in this case, even though made even a few months prior to

Ms. Kragor's termination, and despite their reference to hiring decisions or

otherwise bringing in young blood. *Damon v. Fleming Supermarkets of Fla., Inc*.,

---

that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.") (internal quotations and citation omitted).

196 F.3d 1354 (11th Cir. 1999) (reversing summary judgment in termination case holding statements by decision maker several months later that he wanted "aggressive young men" to be far from a stray remark, but rather presenting probative evidence of the decision maker's state of mind relative to the decision to terminate the plaintiff); *Ryder v. Westinghouse Electric Corp.,* 128 F.3d 128, 130-133 (3d Cir.1997) (holding that remarks made *one year* after termination, and not directly about plaintiff, could be taken by a jury as an accurate reflection of the existing managerial attitude toward older workers) (emphasis added); *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149 (2d Cir. 1998) (upholding verdict for age discrimination plaintiff, and rejecting defendant's stray remarks argument regarding *inter alia* statements mentioning anticipated youth of company's sales force by sales manager who was involved in decision making process to terminate plaintiff, and that plaintiff should watch his ass and that if he looked around he would see all young people).

E.  <u>Replacement by a substantially younger employee</u>

The rush to fire Ms. Kragor is explained by the fact that Takeda needed to find a place for Autumn Jeter, a substantially younger District Manager who was assigned to a geographically remote territory from where she lived in Tennessee but displaced as a result of the TAP merger.  Ms. Kragor's "Chattanooga territory" provided the perfect opportunity to "replace" the very much younger Ms. Jeter in

24

her home territory. And despite Defendant's contention that there were several applicants, just two days after Ms. Kragor was fired, Ms. Jennings (who had firmly echoed Mr. Orlando's desire for young blood), wrote on September 5, 2008 that Autumn Jeter would "take precedence". (Exh. 2) Defendant's promotion of Ms. Kragor in 2005 is beside the point that – *in 2008* – Takeda fired the older employee to make room for the younger employee, the precise paradigm of age discrimination that the ADEA was enacted to prevent.  Taken in context with Dan Orlando's admission that Ms. Kragor had done nothing wrong and should not have been fired, with Takeda's refusal to find out the facts about the buddy passes by interviewing Dr. Bode, with the inconsistent statement by Jason Diaz regarding Dr. Bode's holiday parties, the numerous age-related statements by Takeda's upper level management including Mr. Orlando, the Ms. Kragor's prompt replacement by Ms. Jeter, 18 years her junior, constitutes record evidence from which a jury reasonably could find that Takeda's articulation is pretextual and unworthy of credence, mandating denial of Takeda's motion for summary judgment.

25

<u>CONCLUSION</u>
<u>DEFENDANT'S MOTION FOR</u>
<u>SUMMARY JUDGMENT MUST BE DENIED</u>

Respectfully submitted, this 16th day of May 2011.

<u>s/Robert N. Marx</u>
Georgia Bar No. 475280
Jean Simonoff Marx
Georgia Bar No. 465276
Attorneys for Plaintiff
Marx & Marx, L.L.C.
5555 Glenridge Connector, Suite 200
Atlanta, Georgia 30342
Telephone:  (404) 261-9559
E-mail:  lawyers@marxlaw.com

<u>CERTIFICATE OF COMPLIANCE</u>

In accordance with L.R. 7.1(D), counsel for Plaintiffs hereby certifies that this document was prepared in Times New Roman, 14-point font, as permitted by L.R. 5.1(B).

s/Robert N. Marx_____
Robert N. Marx

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BARBARA KRAGOR,                          x

          Plaintiff,                 :

vs.                                      :      CIVIL ACTION
                                     FILE NO. 1:10-cv-00125-WCO

TAKEDA PHARMACEUTICALS            :
AMERICA, INC.,
          Defendant.                 :
_____ x

## CERTIFICATE OF SERVICE

This is to certify that on May 16, 201I, I electronically filed: **Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment,** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filings to the following attorney of record:

        Patrick F. Clark, Esq.

        Ogletree Deakins Nash Smoak & Stewart, P.C.

        191 Peachtree Street, N.E.

        Suite 4800

        Atlanta, GA 30303

Respectfully submitted, this 16th day of May 2011.

                          **s/Robert N. Marx**

                          Robert N. Marx, Esq.

                          Georgia Bar Number 475280

                          Jean Simonoff Marx, Esq.

                          Georgia Bar No. 475276

                          Marx & Marx, L.L.C.

                          5555 Glenridge Connector, Suite 200

                          Atlanta, Georgia 30342

                          Telephone:  (404) 261-9559

lawyers@marxlaw.com
Attorneys for Plaintiff