IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BARBARA KRAGOR,                          x

          Plaintiff,            :

                              Civil Action No.
                              1:10-cv-00125-WCO

vs.                                      :

TAKEDA PHARMACEUTICALS             :
AMERICA, INC.

                     :

          Defendant.
_____x

## DECLARATION OF BARBARA KRAGOR

I, BARBARA KRAGOR, pursuant to 28 U.S.C. Sec. 1746, declare and state as follows under penalty of perjury:

1. I am the Plaintiff in this action. I submit this Declaration in opposition to Defendant's motion for summary judgment.

2. In addition to the ageist statements I testified to during my deposition, on one occasion, Kirk Barnes told me that I was the oldest District Manager in the region.

3. On one occasion, Jen Jennings said, referring to me, "Can you believe how old her boys are?"

1

4. On one occasion Kirk Barnes said to me, "It is not always good to let people know how old your boys are."

5. There was a District Manager Advisory Board meeting several months prior to my termination. The meeting was held in Lincolnshire, Illinois and attended by District Managers from each region, including myself, who had been selected to be on the Advisory Board. Jen Jennings, who reported to Dan Orlando, attended the meeting, and in fact facilitated it. Dan Orlando, specifically addressing the work force, stated that "we need to hire younger people". One attendee at the meeting commented that as a result of a reduction in force by Pfizer, there were quite a lot of very experienced available as a pool of candidates, and Dan Orlando specifically said that those "are not the people we want", but rather "younger people".

6. At about this same time, Jen Jennings told me that I "have a pretty old district" and that I "need some younger blood in there".

7. Jen Jennings told me that by having pictures of my sons on my screen saver that it "gives away my age".

8. About six months prior to my dismissal, Jen Jennings addressed all of the District Managers in Ms. Jennings' district at an in person meeting in Atlanta. She told all of us that she wanted "young energetic people", that no district manager

2

should send her anyone to interview who was not "young and energetic" because she would reject any such candidate.

9. Soon after this, in 2008, Takeda merged with TAP Pharmaceuticals. As a result of the merger numerous Takeda employees were deemed "assigned but displaced", which meant that those employees effectively did not have a job. One of those employees who was deemed assigned but displaced as a result of the merger was Autumn Jeter. Ms. Jeter was a displaced District Manager residing in Tennessee.

10. Autumn Jeter had been managing the Missouri District while living in Tennessee.

11. At the time that Ms. Jeter was an "assigned but displaced" District Manager living in Tennessee, my district was the "Chattanooga District", which included Chattanooga, Rome, and parts of Atlanta.

12. During my tenure as District Manager, I participated in the decision making process relative to the termination of several employees. It was my experience that even if Human Resources and the Legal Department made a recommendation, the actual decision to terminate had to be agreed to by the District Manager, and superiors, including the Regional Director. I was a participant in the decision to terminate Mike Jones who had been a sales representative in my district and who had been found to have been using his own

3

catering company to supply food, expensing it to Takeda, clearly violating Takeda's compliance policies. While ultimately the decision had been made to fire Mr. Jones, initially the recommendation by HR and Legal to do so was rejected by the Regional Director at the time, Kirk Barnes, who forestalled the ultimate decision.

13. During my employment I was aware of Takeda's Compliance policies. The policies concerning gifting to doctors, meals, travel and entertainment provided to doctors, expensed to Takeda and paid for by Takeda applied uniformly to sales representative and managers. Accordingly, sales representatives and managers, because of their positions, were *not* given differential leeway with respect to compliance with and enforcement of Takeda compliance policies.

14. Pam Cofield was a Sales Representative who for an interim period of time was under my immediate supervision. I became aware that Ms. Cofield was having an affair with a physician, Dr. Michael Brady, who prescribed Takeda products and was in Ms. Cofield's territory. I know of my own personal knowledge that Ms. Cofield was having the affair with and dating Dr. Brady. I was contacted by HR pertinent to an investigation that was being conducted concerning the relationship between Ms. Cofield and Dr. Brady, following a complaint by another physician who indicated that he would no longer attend Takeda speaker events as a result of inappropriate behavior by Ms. Cofield and Dr. Brady. Because I was Ms.

4

Cofield's interim manager, I learned that she was repeatedly improperly using Dr. Brady as a speaker at Takeda events at which he was paid honoraria by Takeda (at least $1000 per event). Ms. Cofield was the only Sales Representative using Dr, Brady as a speaker and thereby providing him with monetary honoraria, as well as bringing him to Takeda sponsored dinners. I am aware that Ms. Cofield was warned against using Dr. Brady anymore because her using him as a speaker for which he was paid ($1000 each time), coupled with her romantic relationship with him, created an appearance of a quid pro quo. Ms. Cofield was not fired.

15. At all relevant times, Bud Kragor, my husband, was employed as a pilot for Delta Airlines. In that capacity, Mr. Kragor was able to obtain discounted airline tickets, known as "buddy passes." As a result of Mr. Kragor's pre-existing friendship with Dr. Bode, and since Mr. Kragor was able to obtain buddy passes as a Delta pilot, Mr. Kragor would from time to time sell buddy passes to Dr. Bode. At all times Dr. Bode would pay the full market price for the buddy pass.

16. When Bud Kragor was in the cockpit he was without his laptop. On one such occasion, Bud was providing a buddy pass to Dr. Bode, but did not have his laptop since he was in the cockpit due to take off. Bud told Dr. Bode to call me so that I could act as an intermediary for my husband to facilitate selling the buddy pass to Dr. Bode.

5

17. Upper level management at Takeda know all about Dr. Bode and Bud Kragor golfing together and about the aforesaid practice whereby I would act as intermediary in Dr. Bode purchasing buddy passes from Bud Kragor. I specifically told my supervisors, Kirk Barnes, Jay Cardiello and Jen Jennings about it.

18. Everybody at Takeda – including but not limited to Dan Orlando – knew that my husband had a pre-existing personal relationship as golfing buddies with Dr. Bode and that my husband, as a Delta pilot, occasionally provided Dr. Bode with Delta buddy passes as part of that relationship.

19. In or about July/August 2008, my husband and two sons were planning a trip to Ireland to golf at a golf course at which Dr. Bode was a member. Dr. Bode made arrangements for the golf outing via his membership, and had the expenses billed to him as a member, with the explicit understanding that Mr. Kragor would reimburse Dr. Bode after he received the bill from the golf club. At or about the same time, Dr. Bode purchased buddy passes from Mr. Kragor, using me as an intermediary since Mr. Kragor was unavailable at the time. Dr. Bode offered to provide his credit card information to be billed for the buddy passes, but I offered to put the expense on my own (personal, not corporate) American Express card to offset the anticipated money that we would owe to Dr. Bode once he received the bill from the golf club in Ireland. After subsequently receiving notice of the amount billed by Dr. Bode, we reimbursed Dr. Bode.

6

20. I never gave anything of value to Dr. Bode. To my knowledge, Dr. Bode at all times paid for the buddy passes that he bought from my husband. I have never given any gift to Dr. Bode.

21. I did not authorize Jason Diaz or anyone else to expense holiday parties for Dr. Bode.

22. Melissa Anderson and Ed Flynn refused my request that they interview Dr. Bode.

Executed on this 16 day of May 2011.

_____
BARBARA KRAGOR

7